099 for Xenius versus Parapharmaceuticals. Good morning, your honors. Joe Swick on behalf of the appellants. May it please the court. This court has characterized a preliminary injunction as a drastic and extraordinary remedy. My argument today is going to focus on three key errors made by the district court in granting this drastic and extraordinary remedy. We stand on our briefs with respect to the remaining errors. First, regarding FARA's inequitable conduct claim, the district court made both a legal error and a clearly erroneous factual error in determining that FARA had not raised a substantial question on its inequitable conduct claim. I'm just interested. Have you found any other cases of ours where inequitable conduct was the validity basis upon which a preliminary injunction was being opposed? Because it seems like inequitable conduct is in a separate box from obviousness and anticipation. And it seems like certainly after Theracents, there are very high burdens that go along with establishing inequitable conduct. I personally don't recall seeing a preliminary injunction case where inequitable conduct was the validity contention. Your honor, my memory is the same as yours. I don't recall any specifically on that issue. And your view on the law is that the district court should have and would have concluded that there was a substantial question of validity or unenforceability, technically, I guess, raised by what you put forward on the inequitable conduct. That's correct, your honor. And what did you put? Especially if they had applied the correct standard. Well, what's the correct standard? Substantial question of validity. Well, your honor, that's the second point I want to make is regarding the preliminary injunction standard, the court made a legal error in applying the Titan tire test for the Amazon.com test for preliminary injunction. Well, isn't this just a question of different linguistics? You have to show the likelihood of success. And that means validity infringement. And if there's a showing that there's a real problem, then you haven't satisfied that Yes, your honor. Okay. I understand. I think there is a very big difference between a substantial question as it's been laid out by the Amazon.com case and the Titan tire standard, which has been laid out. In the Amazon.com case, the way multiple panels in this court has interpreted it is that the as to invalidity or unenforceability in this case. And the other side does have the chance to present their own evidence on the other side. Okay. The only thing I would differ with you is the word you used, only, as if you're caboting substantial question as to not being a big deal. That word only, I don't think, appears in Amazon or any of our cases. The cases apply substantial question of invalidity, which is a pretty stringent standard, is it not? I mean, I have no basis to believe it isn't. Right? Well, your honor, I think we've got to remember the context. This is a preliminary injunction stage where there has not been full discovery. There has not been expert depositions. There hasn't been getting ready for trial. So where do you think the difference is? When you say the district court erred by applying Titan tire. Right. What is the difference between the standard he employed from Titan tire and the standard you derived from Amazon? Right. So Amazon.com has the substantial question, where essentially a substantial question, in my mind, is less than 51%. It's almost similar to a substantial evidence when you're reviewing a factual. How do we know that? I mean, you're interpreting. You're not using the words of Amazon.com. You're coming up with your own conclusion. Has our court ever applied Amazon and said substantial question means less than 51%, less than 50%? No. I'm just trying to explain theoretically what it means in my mind. Why can't we just use the language of the actual factor itself? What's the likelihood of success that the patent owner is going to be able to withstand your unenforceability challenge? Your honor, the problem with using the standard of just likelihood of success is that we have this precedent. We have this case law from Amazon.com, which was the binding presidential opinion. But obviously it has to equate with the actual time-tested standard of likelihood of success on the merits. Likelihood of success that they will be able to prove at trial that your products are infringing their patent. Likelihood of success on the merits of the validity question that they will be able to withstand your unenforceability challenge. And now whatever we've said has to comport with that, has to bend towards that. And so now we have this language, substantial question of validity, substantial question of unenforceability for your purposes. Substantial question itself could be a little indeterminate what that means. It sounds like your preferred conception is something that's rather minor. But I'm not so sure that that would be consistent with the origins of the inquiry, which is likelihood of success on the merits. I understand your point, your honor. And certainly other circuits have talked about likelihood of success as just being likelihood of success. But we've seen that there is multiple panel decisions from this court where they have applied the Amazon. We have a test left by the Supreme Court, likelihood of success. And you're saying two of our panels have used different language. Isn't it the job of this court, this panel, to determine whether the language really means anything different? Yeah, I would certainly welcome that opportunity for the court. Tell me if I'm wrong, but I don't see anything in the cases which we've applied the substantial question standard to diverge at all from what we would use for likelihood of success. I don't think we've ever said it's under 50%. I don't think the narrative in the cases and how we analyze the substantial question points us to something like under 50%. OK, your honor. Am I wrong about that? I'm not aware of any cases, but I will say that the district court itself talked about the different standards from Amazon.com and Titan Tire. And he said, in this case, it may make a difference. So even in the district court's mind, he's seeing a difference in the standards. Am I wrong that the district court's long discourse on the formulations in Amazon and Should he just look at one party's evidence, or should he be looking at both parties' evidence in terms of assessing the likelihood of success on validity or on enforceability? That's not my reading, your honor. My reading is he has seen different standards, different burdens of proof, and he's trying to reconcile which is really the correct burden of proof in this case. And the end, he says, quote, I will therefore attempt to remain faithful to the federal circuit case law and apply the Titan synthesis. And he makes that conclusion, even though earlier in his opinion, he says when there's conflicting panel-type decisions, the older precedent applies. It hasn't been reversed en banc. And in this case, this is Amazon.com. So in one case, he's saying Amazon.com is the test that should be applied. But for some reason, at the end, he gets and says, well, I'm going to apply. He says the test. My understanding of his discourse was he was talking about how Amazon.com could be read to be limited to just looking at the challenger's evidence and argument only and whether that evidence and argument itself raises a substantial question of validity without considering the patent owner's rebuttal evidence. And then he ultimately concluded after reading everything, including Titan Tire, that no, the better reading of Amazon.com to the extent that there's a conflict, which he concluded there wasn't, is that you consider everybody's evidence, everybody's argument in trying to figure out ultimately whether a substantial question of validity has been raised. That's my understanding of the reading. Is there something else in particular? No, he certainly did. Yes, Your Honor, you're absolutely correct that he did go through that type of analysis. And we, as the appellants, have never made the argument that you can only consider our evidence. You know, we've always agreed that it is a way to have evidence on both sides. Okay, so you take that off the table. Where was the court wrong in terms of the standard he applied? Right, right. We've never argued that he can't consider both sides of the evidence. The question is, once you do look at both sides' evidence, what is the standard to apply? And is it that they need to show a likelihood of success on the merits or that we are, they have the burden to show that we're unlikely to prevail on our defenses? Or is it just we raise a substantial question to see if they can counter it? But there absolutely is a difference. Well, what likelihood of success is the test, right? Substantial question on the merits is the reverse of that. It's the negative of the test, right? Your Honor, the way I see it is there is the likelihood of success standard, but the way this court has interpreted what does that mean in various situations is, has the defendant raised a substantial question? This is a preliminary injunction. It's very early stage of the case. Can you look at page A11? Because maybe I'm misreading what he's trying to say there. But the first full paragraph says, Titan Tiger doesn't merely overturn it. It's not a power to do, though. It rather reconciles it. I believe it succeeds in doing that. And then it seems to me the district court is setting up the standard, which is about to apply, placing the burden on the defendant to raise a substantial issue, in which case the patentee must demonstrate the likelihood it will succeed in meeting its ultimate burden of persuasion by clearing convincing evidence. Isn't that exactly? I mean, they use substantial issue rather than substantial question. But where's the discrepancy here between what's wrong with this? Well, what's wrong with that, Your Honor, is he's mixing and matching and trying to I think he's just confused of really what the standards are in the two cases, because that's not what Titan Tiger said. Titan Tiger did not say, well, as long as we raise a substantial issue, then they have to go next. What Titan Tiger said to test is, basically, on page 1378 of Titan Tiger, an injunction shall issue unless the patentee is unlikely to succeed on the merits of the validity issue because the patentee is unable to establish that the alleged infringer's invalidity defense lacks substantial merit. So that's the language of Titan Tiger. I don't know. I'm confused now. I'm sorry. Maybe I've confused you, or maybe myself. But are you advocating a type one? You're presumably saying the two are different. Correct. And which one are you advocating? Amazon.com is the standard that should have applied in this one. Yeah, and that's a substantial question. But in the sentence I just read you, he says we're placing the burden on the defendant to raise a substantial issue. Right. In which case, the patentee, you've agreed the patentee gets to speak out then and try to rebut the substantial issue matter. Why is that not just like what we said in Amazon.com? Because, again, he's meandering through the different case law. He's trying to pick up little pieces of Amazon.com by saying that. But at the end, he says, I'm going to apply Titan Tiger. And that's the test I'm applying. Why is he trying to pick up Amazon.com and almost essentially create a new test where I'm going to take little bits and pieces from Titan Tiger and Amazon.com and essentially come up with my own test? Substantial issue uses that language. That language is not in Titan. We can read our own case law, and we'll figure it out. What other arguments do you have? You're quickly running out of time. Yeah, I know. I see I'm in my rebuttal time, so I'd like to reserve that, if I could, please. Well, is there any other compelling point you want to make with us so we can extend the time a bit? We took a lot of your time discussing this. That's all I want to say on that standard right there. OK, but you said you had three points, and you only got to point one. Oh, OK, if you want to talk about my other points. OK, sure. Just identify them so that you don't waive them. The second issue I want to talk about is the preliminary injunction standard, which you talked about. The third issue I want to talk about is regarding FARA's non-infringement and unclean hands defense. The problem with those defenses is the court ruled against on this, but the court did not make Rule 52A findings a fact. Specifically regarding the non-infringement arguments that we raised, the court said, quote, that it has interpreted the term buffer in such a way that it's fatal to our non-infringement argument. But the question there and the problem there is he never took our- Your argument is that a buffer cannot be a buffer in a solid state. That is one argument, yes. But that's like saying a hammer cannot be a hammer when it isn't banging a nail. It is still a buffer even when it isn't operating as a buffer in solution. Correct. Correct. So there's- Correct, but that's contrary to the argument you made. Well, the problem is, Your Honor, that there is expert evidence on both parties' constructions that were offered, and then there's expert testimony on both theories. Our experts said that a buffer cannot act as a buffering agent in a biathlized solid state. Their experts said, well, it actually can because there's residual moisture that might be there. So what did the district court conclude? Did the district court take their evidence or did it take our evidence? Well, the point is it's a buffer if it's capable of buffering in an appropriate situation. Right. And the appropriate situation in that case would have to be in a liquid state. But the claim is limited to a solid biathlized composition, and that's the problem. So either the sodium phosphate is acting as a buffer in a dry state. We don't think that can happen. Or the sodium phosphate is acting as a buffer in the liquid state, in which case the biathlized composition, which is a required claim, exists in the solid state, no longer exists. So for that reason, we just want to know what the district court concluded on this. There's evidence on both sides. This is an unreviewable issue because the district court made no findings. He took a Markman decision, gave us a Markman construction, and we expected, okay, fine. We understand you made your construction. How does that apply to our specific dibasic sodium phosphate heptahydrate? How does ours act in a way that actually would meet the claim? And that finding is never there, so we can't review that. I can't make arguments to you, and he's really hand-tied everybody in this courtroom because he hasn't made those factual findings. I have a composition reading the toxin, the poison, and it has arsenic in it. You're essentially saying that if it's not administered to a person where it acts as a person, as a poison, it's not a poison. That's essentially your argument with respect to a buffer in a solid state where it's not yet acting as a buffer. It still is a buffer. It's a buffer in some states, but it's not a buffer in other states, and the claims are directly limited to a certain point in time. When you say states, you're not referring to Maryland or Virginia. No, I'm sorry. I'm sorry. It's really certain points in time. A sodium phosphate can act as a buffer and have buffering action when it is in a liquid state, but in a solid state, our contention is it's not. Their contention is it is in certain circumstances. How does that apply to our sodium phosphate, and specifically, which situation is that? We don't know. Okay. We've exceeded your time. We still have a couple minutes for rebuttal. Thank you, Your Honor. May it please the Court. The district court did not abuse its discretion, and FARA has not shown any abuse of discretion. What did you make of this debate we've been having about what standard the district court applied and whether that was correct or not? Your Honor, as we have summarized in the brief, we agree with the way Judge Chen described it. What the district judge here was reviewing was, can he look at the patent owner's evidence to determine whether there was a likelihood of success or not? And that's how the district judge read the case law. As it turns out, and as the district court noted, as applied, those cases that he was referring to also look at both sides' evidence, including the Amazon case itself. And here, as applied, we don't believe that that debate has to be resolved in this particular case, although if it were, we've favored the Titan Tire because it's a clearer recitation and because it takes eBay into account. But the reason it doesn't need to be resolved or the resolution of it does not affect the outcome is because the district court said on page 23, under either analysis, Fresenius Cabe had shown a likelihood of success on the merits as to this inequitable conduct claim that's not being raised. You did say that on one particular point it would be a closer question, right? Yes. In the beginning of the opinion, he notes that where there is a close question, that's where he's going to address it. And on page 23, he says it would be a closer question under the way he applied or understood the Amazon test. But even as to that, which was literally, did they raise a substantial question or not, the district court said no. And on the same page, it's because likelihood of success, particularly on intent, there was no evidence, no showing of any kind as to evidence of intent to have the inequitable conduct called into question. Before I forget, how come there isn't a 30-month stay in this case? There isn't a 30-month stay in this case because of the timing events stressed in a footnote in the district court's opinion. But essentially, the patent here was listed after the ANDA was submitted. So that the timing was that the patent, the whole timeline of events was Fresenius Cabe developed its product, applied for a patent, launched its product. Then there is an ANDA that was submitted. Then the patent gets issued. So under that timeline of events, there isn't an automatic 30-month stay. But FARA still has the obligation to say, here's a notice letter with your patent enlisted, and then we go forward in the litigation. But there's no 30-month stay where the patent is listed after the ANDA is filed. I see. Okay. Referring then to the standard of review, I think we've addressed that particular question. Council then also spent and addressed the inequitable conduct issue. But again, that really relates to the same point that the district court made, that under either analysis, Fresenius Cabe was likely to succeed. And particularly the intent prong, which we don't even read as being appealed in the opening brief, that was enough to show that Fresenius Cabe had a likelihood of success on the merits. What about your friend's final point, which was the absence of factual findings with respect to the infringement and its relationship to the claim construction argument? Your Honor, we do believe there were sufficient findings here because there was only one issue that FARA itself had even presented. And as the district court notes on page 11 of the opinion, FARA's only objection was a claim construction issue. Can it be that you call something a buffer in a solid before it's put into the liquid? And the district court resolved that issue, which was a claim construction issue, as a matter of law with the claim construction order issued the same day. And important to note, the claim construction opinion was incorporated by reference in the preliminary injunction decision. This is another fact that the reply brief didn't address, saying that there were two different things. I don't understand. So you're saying that it was the other side kind of waived, that they conceded at some point that under the claim construction that the district court reached, they would lose on infringement? Your Honor, they didn't expressly waive it, but here's what happened, and the district court addresses this on the bottom of page 10 going into 11, that Fresenius Cabe submitted an expert report by Dr. Klibunov addressing all of the elements, and the district court says on the top of page 11, the only item that FARA challenges from that, and we agree that was the correct factual finding. Are you sure we're looking at the same thing, because I'm not seeing... The bottom of 11 going to 12, I apologize, Your Honor. Okay, all right. Bottom of page 11, Fresenius' expert submits that FARA's proposed generic formulations fall within the limitations of each of those claims. So there's a finding that the judge has made that as to the elements, an expert has submitted an analysis, and the next sentence says, FARA's only challenge to those infringement allegations per se is that the patent requires the buffer, and goes on from there to this liquid versus solid analysis, which the district court says his claim construction opinion renders that argument and distinction fatal, and therefore there is a likelihood of success for Fresenius Cabe at trial. At this point, when the preliminary injunction motion was granted, did the other side have an opportunity yet to depose your expert who filed the declaration in the prosecution? Opportunity, yes, but they didn't take it. And what I mean by that is, Your Honor, the parties discussed how should discovery proceed, and Fresenius Cabe issued deposition notices, and FARA's counsel called and said, maybe we don't need discovery, let's work it out, and then they submitted a letter to the court saying, we don't believe discovery is required, and that is what happened. So what's going on now? This preliminary injunction issue is like a year ago, right? It wasn't a year ago. The litigation is still ongoing, Your Honor. There's no trial date that's been set. There are some discovery items that remain open, and we expect discovery would close by the end of the year and trial sometime next year. In the 084 provisional, which is incorporated by reference into the patent, I understand that, it talks about there's formulations A and B, and there's a parentheses range for A, 0.16 to 0.34, and for B, 0.22 to 0.27. Just curious, are those ranges the same kinds of ranges that you see in Table 2 for formulation CDE where they represent ranges over time? Or are they individually tested versions of A where they were just all over the map and they just tested at these particular levels? Your Honor, the data for A and B was not in the provisional, and I think that's why you're asking what does the actual data show. The provisional spec says the T3 did not increase over time, but then in these parenthetical ranges, the suggestion is if you go from 0.16 to 0.34, if you're using the same kind of analysis that you're using in Table 2, well that is a change in an increase over time. So that's why I'm just trying to understand what do these ranges actually represent. Unfortunately, the record doesn't have the data side-by-side in that provisional for that point, so I don't have the answer to that from this. We do know from the other data, though, that Your Honor is correct, there is a difference in the way the slopes are over time, but it just depends on what the comparison is. So if the comparison is A, B to CDE, you would see a difference over time. But to make sure that we're getting in the context of the issue presented, what the appellant is saying is that this data should have been included in the utility. I understand. I'm trying to figure out if you can explain to me what did this provisional application mean when it said formulations A and B for T3 did not increase over time, and yet we have parentheticals that the most reasonable reading would suggest that they do increase over time, unless there's some other understanding of what those ranges represent. There is no other understanding. They could be interpreted both ways. When you say both ways, what are the two ways? That there was no increase over time. How would that be no increase over time, 0.16 to 0.34? I'm sorry, that the data was interpreted as no increase over time depending on where those data points were. One way to read it is 0.16 was at the beginning and 0.34 is at the end. Another is it could be it says varied from 0.16 to 0.34, so it can go up and down, as has happened in other of the sets of reported data. Unfortunately, it's just not clear whether the person reviewing that underlying data was looking at it and saying here's a trend that I do or don't see, or if there was an up and down of the same numbers. But to make sure that we're talking about the same thing here as far as it affects the appeal, though, Your Honor, all of those A through E were about 10 mg of mannitol batches. So the point here is that they were not the claimed invention. All of those used the higher prior art levels of mannitol, and that's what is different than what was discussed in the full utility application and the later declaration, all of which focus on what happens if we go from 10 mg to 3 mg of mannitol. And that did show in all of those cases a trend of increased resistance to the stability issues that had been observed. Using a dibasic buffer, right? Correct. What about for a tribasic buffer? Going from 10 mg mannitol to 3 mg mannitol. Is there anything in the record that says, yes, ooh, this is unexpected? We also get increased stability when we go down from 10 to 3 mg mannitol for a tribasic. For one tribasic to one dibasic. No, from tribasic you stay with tribasic with 10 mg mannitol, and then you stick with tribasic with 3 mg mannitol. Do you get the unexpected results, the allegedly unexpected results? Yeah, I'm not aware of data on that particular point because by the time of the declaration the comparisons had been made of two kinds, dibasic versus dibasic in Figure 1 of the declaration that the inventor had submitted, and then the dibasic of the invention versus the tribasic of the prior art in Figure 2. That's where the declarant said they compared T4 with the claimed invention using dibasic against a grandfathered product? Is that the grandfathered product, the 10 mg mannitol with tribasic? Yes, correct, Your Honor. So Figure 2 was making the comparison of what happens when you compare the invention to the prior art, literally head-to-head, which is what the examiner was asking, and Figure 1 was saying if we stay within dibasic but only change the mannitol, what happens? In both cases there was improvement of the stability results. And as earlier in the provisional I had noted, if the dibasic is what they believed to have been better, so then when they were working within the dibasic to dibasic in Figure 1, that's what they were able to show was the effect of increased stability resistance was really due to the 3 mg of mannitol and not to any of the other variables. That's the conclusion they were able to reach. And the examiner in the Notice of Allowance said, yes, I see that that shows the difference between 10 and 3 mg of mannitol does have an unexpected benefit to stability. And here the district court looked at that analysis and concluded that there, as a matter of fact, that was no substantial question had been raised and then said that under the traditional Rule 65 analysis that there would be no likelihood of success for FERA and a likelihood of success for Fresenius copy on the merits at trial. Your Honors, unless there are other questions, I'm happy to cede the time on other issues. Thank you. Your Honors, just a few more points in rebuttal. Regarding the evidence that FERA presented on the non-infringement defenses, there absolutely was non-infringement evidence submitted by the declaration of Dr. Palmieri and the joint appendix citations for that are APX 1909, 1914 through 1915. And then the counter evidence by Dr. Klibunoff was on pages 2214 through 15, 2227 through 29. Your Honors, counsel raised the merits of the inequitable conduct claim and the fact that the tri-basic sodium phosphate data was omitted from the non-provisional. It was in the provisional and then, for some mysterious reason, and we still have not gotten a reasonable explanation why, when it came time to file the non-provisional, that data disappears. After the non-provisional application is filed, the examiner looks at it and says, that's interesting, what I'd really like to see is a comparison between the tri-basic sodium phosphate compositions and this di-basic sodium phosphate compositions that you have. And it's ignored. They don't raise their hand and say, examiner, guess what, we actually did present that data a long time ago and that data actually showed that tri-basic sodium phosphate was stable over time. They never raise their hand. In fact, they next do a declaration where they again go to this di-basic versus di-basic comparisons. The examiner has told them, I want to see the closest prior art comparison. That's never done by them. We know the evidence existed. It was in the provisional. It's never mentioned. And it's ultimately tremendously unfair that the examiner never had the opportunity to look at that data. The data is what matters to the examiner. The examiner doesn't have the ability to go out and create this comparison. Incorporated by reference, though, and there's no dispute that the provisional was incorporated by reference, then we have case law where we have said as a matter of law that's treated as if those contents are actually in the application itself. And so they, so, I mean, we can't know whether the examiner actually read the contents of the provisional, but it's hard to say that there has been some specific intent to deceive the examiner when the examiner is charged with reviewing and reading the actual specification, which these contents have been incorporated into. And, Your Honor, regarding the case law and specific intent, I think the MPHJ versus RICO case that we just cited is really very instructive as to the intent. And again, that was an incorporation by reference type situation where the non-provisional was trying to incorporate the provisional. It was looked at in terms of claim construction, and did the applicants really have an intent to limit the construction in a certain way? And because information that was limiting in the provisional was pulled out by the time it went to the non-provisional, this court found that, wow, that really shows a lot of intent, that they had it in the provisional, it got yanked out when it came time to the non-provisional, that showed an intent they really wanted to give up the limiting information. So incorporation by reference, as this court said, is a question of law. It's reviewed de novo, and in this case, we think the MPHJ versus RICO case is quite instructive to show how, when you look at the broad circumstances and all the circumstances in here, you will see an intent to omit the information. One final point. All right, Your Honor. Your Honor, I just want to say another error that we think the district court made was in ignoring the examiner's reason for allowance when she said that she was allowing claims in this case, quote, since applicants have discovered that the previous formulations are unstable. The problem with that is we know the previous formulations were not unstable. The previous formulations were the tri-basic containing formulations that were in the provisional, but then were never highlighted in the non-provisional. So the premise for the examiner's allowance is, well, they've shown that the prior arts grandfather products are unstable, so now they have a new stable version. Well, the problem is that premise is wrong. It's dead wrong. We know from the information that was yanked out of the provisional application that there was data showing that the grandfathered prior art compositions containing tri-basic sodium phosphate was stable over time. So that's the last point I want to make on that. Unless Your Honor has further questions, I'll conclude. Thank you. Thank you.